UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ELEMENT SIX, S.A., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 14-13600-LTS |
| FRANKE FOODSERVICE SYSTEMS, INC., | ) ) ) ) | |
| Defendant. | ) ) ) | |

ORDER ON MOTION TO STAY

October 30, 2014

SOROKIN, J.

Plaintiff, Element Six, S.A. ("E6"), a Luxembourg corporation, filed this action for the sole purpose of obtaining an order staying arbitration of claims Defendant has asserted against it in an arbitration proceeding commenced by Defendant against Plaintiff's indirect subsidiary, Electrolytic Ozone, Inc. ("EOI"). Defendant opposes the Motion to Stay, contending that E6 should be bound to arbitration on the basis of various theories, including alter ego, and asserting that it has proffered sufficient facts to warrant deferring resolution of the stay motion until after the completion of discovery regarding arbitrability against E6.

I.      BACKGROUND

The parties agree that E6 was not a signatory to any contracts with Franke. In 2011, Defendant, Franke Foodservice Systems, Inc. ("Franke"), and EOI, but not E6, entered into a ten-year "Sales and Services Agreement" (the "Agreement") for the development of products

("Product") and the provision of services for industrial icemakers.  Doc. No. 1 ¶ 7.  The Agreement contains an arbitration provision committing "ALL DISPUTES OF ANY NATURE BETWEEN [EOI] AND FRANKE ARISING UNDER, OR IN CONNECTION WITH, THIS AGREEMENT" to be resolved exclusively through arbitration under the laws of Massachusetts.  Doc. No. 2 at 10 ¶ 13.

On January 14, 2014, Franke submitted a demand for arbitration to the American Arbitration Association ("AAA") in Boston, Massachusetts, against both EOI and E6, arguing that, while E6 was not a signatory to the Agreement, it should be so bound under theories of alter ego, third-party beneficiary, estoppel, or agency.  Doc. No. 1 ¶ 10-11.  E6 avers that it did not agree to be bound to arbitrate anything with Franke, and furthermore, that it is not a party to any contract, license, supply agreement, or agreement of any kind with EOI.  Doc. No. 1 ¶ 9.  E6 objected to Franke's demand (and later, Franke's amended demand for arbitration) to enforce arbitration on E6, but the AAA declined, at least at an initial stage, to act on E6's objections.[1]  Doc. No. 1 ¶¶ 10-17.

The following summary is drawn from Franke's amended demand for arbitration, Doc. No. 2-3, its response to E6's motion to stay arbitration, Doc. No. 20, and attachments to its response consisting of some email exchanges in 2013 and 2014.  Franke submitted no affidavits or declarations to support its allegations.

In 2011, EOI and Franke entered into the Agreement under which EOI contracted to develop and sell proprietary Products to Franke for use in industrial icemakers.  Doc. No. 2-3 ¶ 3.  E6 provided EOI with boron doped diamonds required for manufacture of the Products.  Doc. No. 2-3 ¶ 3.  According to Franke, the Products were made from these diamonds, components

---

[1] E6 maintains it is a foreign party not subject to personal jurisdiction in the Commonwealth of Massachusetts, but appears in this Court out of necessity for the sole purpose of seeking intervention in the arbitral proceedings.

manufactured by EOI, and intellectual property "partly owned by EOI and partly licensed by E6 to EOI."  Doc. No. 2-3 ¶ 3.

Franke alleges that in the spring of 2013, E6 notified Franke of its intention to discontinue EOI's ongoing engineering and design operations in its Massachusetts facility.  Doc. No. 2-3 ¶ 7.  Over the next nine months, E6 and Franke negotiated the possible sale to Franke of some or all of EOI's operations.  Doc. No. 20 at 1.

During this negotiation period, discussions between personnel from Element Six Technologies[2] and Franke secured some funding for EOI's operating costs in the form of prepayments from Franke on certain orders under the Agreement.  See Doc. No. 20-1 at 33-35 (email exchanges).  In the September 2013 email chain between Adrian Wilson, Head of the Technologies Division of Element Six Technologies, and Hans-Juerg Ott, Chief Operating Officer of Franke, Wilson asks, "Would the 50% payment make sense from your side also?  Who would we need to speak to in Franke to action this payment?"  Doc. No. 20-1 at 35.  Ott responded, "yes – I had already talked to Tom Campion about sending a pre-payment on the order that we placed last week.  50% is ok.  The best person to talk to is Anthony Lee, as the payment will be handled through the US organization."[3]  Doc. No. 20-1 at 35.  Wilson then wrote to Lee, Franke's Corporate Controller, "As you may have heard from Tom, Franke will be financing EOI thru the end of Oct at which point we expect the transaction will have concluded.  EOI have virtually no money left and Tom/Hans have agreed to pay 50% upfront for the 3000 unit order."  Doc. No. 20-1 at 34.

---

[2] Element Six Technologies is the company identified in the signature blocks of the emails sent to Franke regarding funding for EOI.  Doc. No. 20-1 at 33-35.  The parties do not define the relationship of "Element Six Technologies" to E6 (whether a division or subsidiary of E6, for example).  The Court assumes without deciding that Element Six Technologies is an arm of E6.
[3] Tom Campion is Franke's Chief Executive Officer.  Doc. No. 20 at 8.

In October 2013, Chris Pilgrim, the Finance Director for Element Six Technologies, wrote to Lee that according to "Wayne,"[4] EOI required more funding:

> I had a call with Wayne today and based on his forecasts he will require an incremental funding of $150,000 . . . by the end of this week and this will take him through to end October. Would you be able to make a payment for $150k to EOI this week, we have a couple of options as to how we structure this:
> 1. Further payment on account against recent order for 3,000 spay bottles
> 2. Payment on account against Sept running costs for EOI that Franke has agreed to fund – from speaking with Wayne and Jackie earlier today they still have some work to do to close out September but the costs incurred would be in excess of $200k
>
> Can you let me know your thoughts[?]

Doc. No. 20-1 at 38.

By late 2013, the negotiations for selling EOI to Franke broke down. In a letter dated November 27, 2013, from Walter Huhn, the Chief Executive Officer of E6, to Alexander Zschokke, Chief Executive Officer of Franke, E6 curtailed negotiations and advised:

> In the coming weeks EOI will be in contact with Franke regarding the orders placed on that company by Franke. As we will be closing down the EOI operations in Boston, you will appreciate that the position EOI is now in will result in significant disruption to the company and its customers. This is regrettable but was a position that you were made well aware of throughout the negotiations. Indeed, it was the primary reason for entering into the transactions.
> . . .
> For the sake of clarification: the pre-payments received for Franke orders towards EOI will be treated as the method of covering the agreed operating costs. There are no outstanding shipments for which payment has been received.

Doc. No 20-1 at 40-41.

Subsequently, three employees of Element Six Technologies addressed the relationship going forward, discussing with Franke payments for open invoices and scenarios for an ongoing supply of the Product. The first such email in the record is from Adrian Wilson in December 2013. It states, inter alia:

---

[4] Wayne is not identified in the email. Nor does Franke identify Wayne in its papers. However, E6 entered into the record EOI counterclaims in the underlying arbitration, which identify a Wayne Lieberman as the Chief Executive Officer of EOI until his separation from EOI in December 2013. Doc. No. 25-1 at 13.

> We are prepared to discuss scenarios for ongoing supply. Initially through the completion of the order you have placed with EOI as part of the "orderly wind down", assuming we come to an amicable agreement on the treatment of the cost coverage for Sept/Oct, thereafter thru an alternative commercial arrangement with E6 directly.
>
> In terms of product development, we are open to discrete packages of NRE on a project by project basis.
> . . .
> If you are OK with this approach, then we're happy to outline scenarios for ongoing supply. However, if these proposals are not going to work for you, then perhaps it would be better to just kill the product now before high volume adoption occurs.

Doc. No. 20-1 at 43.

Another email, also sent in December 2013, is from Hossein Zarrin, Head of the Water Technologies division of Element Six Technologies.  It announces his intention to support Franke's effort to launch one of the product lines.  Zarrin states:

> I have the support of E6 engineering team to make it possible. We have brought back the EOI manufacturing team to continue production of the open PO's. We do not have the same team of engineers that you have gotten used to working with, but we have contracted some of the EOI engineers to make this transition smooth.

Doc. No. 20-1 at 47.

Finally, on January 2, 2014, at a time when EOI had a corporate existence, but no employees, Chris Pilgrim, the Finance Director for Element Six Technologies, emailed Franke's Corporate Controller, Anthony Lee, a request for payment of the "$245k in open invoices owed by Franke <u>to</u> <u>EOI</u>."  Doc. No. 20-1 at 56 (emphasis added).  Two weeks later, on January 14, 2014, Franke submitted a demand for arbitration against EOI and E6 to the American Arbitration Association in Boston, Massachusetts.  Doc. No. 1 ¶ 10.

II.     <u>DISCUSSION</u>

The Court has summarized the factual record, such as it is, in the light most favorable to defendant by including within the summary both bare factual assertions appearing in legal memos, which are devoid of any evidentiary support despite the provisions of the Local Rules,

5

see LR, D. Mass. 7.1(B), and the handful of emails submitted by the parties.  This record neither supports applying the arbitration clause of the contract to E6 (a point defendant concedes) nor Franke's more modest objective of obtaining discovery in support of the theories it advances to apply the contract to the non-signatory E6.[5]

Franke does not propose any standard by which the Court should measure whether it has submitted sufficient evidence to warrant discovery on arbitrability, though it does cite to several cases permitting limited discovery regarding arbitrability or personal jurisdiction.[6]  E6 contends that the pleading standard under Ashcroft v. Iqbal, applies.  See 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Three principles are apparent. First, discovery is not a "fishing expedition."  See Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 8 (1st Cir. 2011).  "[P]arties must disclose some relevant factual basis for their claim before requested discovery will be allowed."  Milazzo v. Sentry Ins., 856 F.2d 321, 322 (1st Cir. 1988) (per curiam).  Second, in other analogous contexts Courts have required some preliminary showing before permitting discovery.  See, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (pleading requires sufficient facts to plausibly state the claim); Negron-Torres v. Verizon Commc'ns, Inc., 478 F.3d 19, 27 (1st Cir. 2007) (plaintiff

---

[5] Franke advances Massachusetts state law theories and E6 addresses the matter under Massachusetts state law. Accordingly, the Court does the same.  But see InterGen N.V. v. Grina, 344 F.3d 134 (1st Cir. 2003) (applying federal common law where New York Convention under chapter 2 of Federal Arbitration Act pertained).

[6] The cases Franke cites concern issues not before this court or involve parties obtaining discovery after making a sufficient preliminary factual showing.  InterGen N.V. v. Grina, 344 F.3d 134 (1st Cir. 2003) (noting, but not otherwise discussing or approving the grant of preliminary factual discovery); Ernest v. Lockheed Martin Corp., 2008 U.S. Dist. LEXIS 31799 (D. Colo. Apr. 4, 2008) (allowing discovery on whether plaintiff signed the arbitration agreement in light of defendant's evidence that the signature on the agreement matched a known exemplar of plaintiff's signature); Dun Shipping Ltd. v. Amerada Hess Shipping Corp., 234 F. Supp. 2d 291 (S.D.N.Y. 2002) (permitting discovery regarding both the identity of the "owner" as known to the contracting parties where the identification in the contract was ambiguous and whether a non-signatory was bound in light of evidence the non-signatory signed a related bill of lading and was the customer requiring the transportation secured by the charter agreement); Miller v. Cotter, 863 N.E.2d 537 (Mass. 2007) (ruling on enforceability of arbitration clause not whether clause bound particular party).

must make colorable claim for existence of personal jurisdiction to be entitled to jurisdictional discovery). Third, courts determining arbitrability "begin with first principles: 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003) (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986)). Measured against these principles, Defendant fails to submit sufficient evidence to warrant discovery on any of its theories.

First, defendant asserts that E6 sufficiently blurred the lines between it and EOI such that Franke is entitled to take discovery in support of piercing the corporate veil pursuant to My Bread Baking Co. v. Cumberland Farms, Inc., 233 N.E.2d 748 (Mass. 1968). "Occasion for [piercing the corporate veil] arises when (1) there is active and pervasive control of related business entities by the same controlling persons *and* there is a fraudulent or injurious consequence by reason of the relationship among those business entities; or (2) there is 'a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.'" Evans v. Multicon Constr. Corp., 574 N.E.2d 395, 398 (Mass. App. Ct. 1991) (emphasis original) (quoting My Bread Baking Co., 233 N.E.2d at 752). Evidence (or information) that the owner of EOI (E6) engaged in negotiations with Franke over the sale of EOI, discussed winding up EOI's operations in the course of these negotiations, demanded upfront payments to EOI, and proposed (or Element Six Technologies proposed) an "alternative [to the Agreement] commercial arrangement" directly between E6 and Franke is not evidence of pervasive control, fraud, a substantial disregard for separateness, or a serious ambiguity

regarding conduct.  See My Bread Baking Co., 233 N.E.2d at 752.  Rather than supporting an inference of confused intermingling or fraud, the emails paint the contrary picture of an owner closing a business, but distinguishing between the business' activities and future activities another entity might undertake.  "Even where there is a common control of a group of separate corporations engaged in a single enterprise, failure to meet the criteria established in My Bread Baking Co., . . . will defeat any attempt to pierce the corporate veil."  Miller v. Honda Motor Co., 779 F.2d 769, 773 (1st Cir. 1985).

Second, without further elaboration, Franke suggests that discovery could uncover evidence that E6 assumed some obligations under the Agreement in 2013.  Franke offers no evidence of either express or implied assumption by E6.  "A *prima facie* case of implied assumption of contract is established where a corporation accepted the benefits of a contract with knowledge of its terms."  Devine & Devine Food Brokers, Inc. v. Wampler Foods, Inc., 313 F.3d 616, 618 (1st Cir. 2002).  Here, Element Six Technologies was attempting to facilitate an "orderly wind down" of the existing orders and discuss "alternative commercial arrangements" for ongoing supply of the Product.  Far from accepting the benefits of the Agreement, Element Six Technologies, was trying to chart a different course, offering to continue Product supply and development under alternative arrangements, including a "project by project basis."  At the same time, Element Six Technologies recognized it might be necessary to "kill the [P]roduct" should none of the alternatives "work" for Franke.  This is not evidence suggesting assumption.

Third, Franke contends that E6 should be bound by the Agreement as a third-party beneficiary because: 1) E6 supplied the boron doped diamonds required to make the Products, and possibly supplied necessary intellectual property, thus, the ten-year Agreement provided E6

8

with a guaranteed purchaser of its diamonds and technology for ten years; and 2) E6 held pervasive control over EOI.

Massachusetts has adopted the rule of the Restatement (Second) of Contracts § 302 (1981) and "limit[s] enforcement by beneficiaries to those who are *intended* beneficiaries." Miller v. Mooney, 725 N.E.2d 545, 549-50 (Mass. 2000) (emphasis original). "[T]he law requires 'special clarity' to support a finding 'that the contracting parties intended to confer a benefit' on a third party." InterGen N.V., 344 F.3d at 146 (quoting McCarthy v. Azure, 22 F.3d 351, 362 (1st Cir. 1994)). "It must appear from the language and circumstances of the contract that the parties to the contract clear[ly] and definite[ly] intended the beneficiaries to benefit from the promised performance." Miller, 725 N.E.2d at 550 (internal quotations omitted). Franke points to nothing in the Agreement, and the Court sees nothing there, to suggest that Franke and EOI intended to benefit E6. To the contrary, there are no references to E6 in the Agreement, and but a single reference to **Element Six Ltd.**,[7] which states the following contingency: "***Assuming*** [EOI] has licensed from Element Six Ltd. . . . Franke has no knowledge of a claim . . . that the Products . . . infringe[] any copyright . . . ." Doc. No. 2 at 9 ¶ 10(c) (emphasis added). There is no sign in the Agreement that E6 had any role, definitive or otherwise, in the contracted activities. Franke's assertions, that E6 was a supplier of, and exercised pervasive control over EOI, are wholly insufficient to allege third-party beneficiary status. Thus, there is no basis for discovery.

III.   CONCLUSION

For the foregoing reasons, Defendant's request in opposition to the Motion to Stay for discovery (Doc. No. 20) is DENIED, the Motion to Stay (Doc. No. 3) is ALLOWED, and the Court hereby ORDERS that the arbitration commenced by Defendant, Franke Foodservice

---

[7] Element Six Ltd. is not identified in the record.

9

Systems, Inc., insofar as it is against Plaintiff, Element Six, S.A., is hereby STAYED. As nothing further remains to adjudicate in Plaintiff's Complaint, the Clerk shall CLOSE this case.

    SO ORDERED.

    /s/ Leo T. Sorokin
    Leo T. Sorokin
    United States District Judge